IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| ANGELA STEWART, | § § | |
| Plaintiff, | § § | |
| v. | § § | Case No._____ |
| | § | JURY DEMANDED |
| GREAT AMERICAN STEAMBOAT CO., LLC. | § § § § | |
| Defendant. | § § | |

_____

# COMPLAINT

_____

**COMES THE PLAINTIFF, ANGELA STEWART**, filing this Complaint against the Defendant, **GREAT AMERICAN STEAMBOAT CO.**, LLC. She shows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a citizen and resident of Memphis, Tennessee (Shelby County).

2. Defendant, Great American Steamboat Co., LLC, is a foreign entity (Delaware) operating in Shelby County, Tennessee where it employed the Plaintiff.

3.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Title VII of the Civil Rights Act, 42 U.S.C. §2000(e) et. seq.  Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission, received a Notice of Suit Rights dated November 17, 2012, and has now timely commenced this action within ninety (90) days thereafter.  Accordingly, Plaintiff has exhausted administrative prerequisites.

4.     Venue in this Western District of Tennessee is proper pursuant to 28 U.S.C. § 1391, because the Defendant was either doing business in this district or resides in this district, and a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTUAL BASES FOR SUIT

5.     Plaintiff began working for Defendant on or about November 17, 2011 as Defendant's Human Resources Director.

### DEFENDANT'S EQUAL EMPLOYMENT POLICIES

6.     Applicable to all employees, Defendant published a "Policy & Procedures Manual" which establishes "guidelines to govern your daily activities as a crewmember of Great American Steamboat Company." (P. 3).

7.     The Policy & Procedures Manual contains further, more specific policies, including a "Harassment" policy and "Rules of Conduct" policy.

8.   Under the "Harassment" policy, Defendant has elected very broad and strongly worded policy.  For example, "[a]ll crewmembers are advised that all forms of derogatory or objectionable conduct designed to be, or having the effect of being offensive to another crewmember are prohibited and will be grounds for disciplinary action." (P. 7).  Examples of harassment include, but are not limited to, "name calling," "sexually explicit jokes," "comments about a crewmember's anatomy or dress," "sexually oriented noises or remarks," and "patronizing terms or remarks."

9.   Under the "rules of conduct" policy, disciplinary action may be appropriate for, *inter alia,* a "failure to have or maintain, management's judgment, satisfactory working relationships with other crewmembers, including supervisors," and "[l]ack of proper judgment in carrying out job responsibilities or when acting as a representative of Great American Steamboat Company." (p. 13).

10.   In order to allow employees to "correct identified problems" and to "reduce turnover," Defendant also has a policy on Disciplinary Action. (p. 11-12).  Under this policy, a "Disciplinary Action program" may consist of four levels:  Verbal Warning, Written Warning, Suspension, and Termination. (P. 12).  Normally, these levels are documented on a "Notice of Disciplinary Action" form.

11. As the Human Resources Director, Plaintiff was charged with making sure that Defendant's policies were applied uniformly and not in a discriminatory manner.

## THE APPLICATION OF THE EEO POLICIES TO MEMBERS OF DEFENDANT'S HIGHER MANAGEMENT AND EMPLOYEE LEVEL

### A. D. KENDALL GRISBY – PRODUCT DEVELOPMENT

12. In 2012, D. Kendall Grigsby was Defendant's Vice President of Product Development.

13. In Plaintiff's role as Human Resources Director, an employee made a complaint against Mr. Grigsby. This complaint included that Mr. Grigsby was spreading a false rumor that the employee was "sleeping" with a co-worker.

14. After investigating the matter, and speaking to witnesses, Plaintiff determined that Mr. Grigsby should receive the beginning level of discipline, a "Verbal Warning."

15. Defendant's Chief Executive Officer, Mr. Jeff Krida, reviewed the Grigsby matter. On or about December 6, 2011, Krida determined that the discipline should be "softened," so it was changed from a verbal warning to a "Policy Reinforcement Discussion." This PRD stated, in part, "[o]ver the past few months, comments have been made by you regarding other employees which may deem inappropriate or offensive." The documentation was said to

"serve as a policy reminder, and not formal discipline."

### B.     CHRISTOPHER A. KYTE—PRESIDENT

16.    In 2011 and 2012, Christopher A. Kyte was Defendant's President, who reported to the Chief Executive Officer, Mr. Jeff Krida.

17.    On November 10, 2011, Mr. Kyte addressed the status of the position of Senior Vice President of Sales in an email to Defendant's corporate human resources department.  In his email, Mr. Kyte addressed various performance deficiencies of the existing Senior Vice President of Sales and stated, "I am not sure if it is an age thing or personality issue . . ." while also commenting that he "IS fantastic" and  "the best in the company at Charter Sales…."

18.    Mr. Kyte recommended replacing the existing Senior Vice President of Sales with someone who is "a great guy, much younger and more dynamic I have known for years . . . ."

19.    Corporate Human Resources, through Christina Price, responded that Mr. Kyte's recommendations were valid, but she would "REALLY appreciate it if you could please edit and resend this email to me, eliminating all reference to AGE."  Mr. Krida, the Chief Executive, agreed with removing these ageist sentiments, saying so in a responsive email copied to Plaintiff.

20. Both Ms. Price and Mr. Krida copied Plaintiff on their email strings and, thus, Plaintiff became sensitive to possible discrimination—and certainly mixed signals of discrimination—concerning Mr. Kyte, and how Mr. Krida, too, was aware of this.

21. Plaintiff, in her role of Human Resources Director, had to address another issue of inappropriate language involving Mr. Kyte. Specifically, Plaintiff learned that, in an email he circulated, Mr. Kyte had referred to females, as a supposed "joke," in a disparaging manner. This was another example of him sending, at a minimum, mixed signals about his beliefs concerning a protected class of individuals.

22. To Plaintiff's knowledge, no formal discipline was issued to Mr. Kyte.

## C. <u>CATHERINE TURNER—CREW MEMBER</u>

23. In December of 2011, Catherine Turner was a Crewmember for Defendant.

24. In Plaintiff's role as Human Resources Director, it was brought to her attention that Ms. Turner allegedly made disparaging comments about disliking working for Defendant and a complaint about Defendant taking away holidays.

25. Plaintiff investigated the matter and, on or about December 21,

2011, consulted with corporate human resources about the level of discipline to engage. Plaintiff explained that, on the one hand, there were concerns about company representations that had been made and, on the other hand, Ms. Turner's attitude may be contagious and harm the company.

26.    On December 25, 2011, Plaintiff made a recommendation to corporate human resources, with a copy to Defendant's Chief Executive, that Ms. Turner *not* receive "formal discipline," but instead be issued a "Policy Reinforcement Discussion," the same that she had recommended for Grigsby.

27.    In reaching this recommendation, Plaintiff pointed out the precedent with Grigsby, a male. Plaintiff stated that Ms. Turner falls into two protected classes (female, and pregnancy) and, therefore, giving her a different discipline than a male could be discriminatory. Plaintiff added that Ms. Turner had the highest sales rate and no attendance issues; therefore, terminating her employment or changing her employment status to part time might be considered "pretextual."

28.    By giving her a Policy Reinforcement Discussion, Plaintiff reasoned, Ms. Turner's negativity would be addressed, in a manner consistent with the recommendation for Mr. Grigsby.

29.    On December 26, 2011, Defendant's Chief Executive Officer, Mr. Jeffrey D. Krida, responded to Plaintiff's email. Mr. Krida agreed that

"absolute consistency regardless of seniority of position regarding inappropriate communications and that Christopher [Kyte] and I both agree to sign up to support this degree of consistency on this subject regardless of whatever ineptness may be the provocation, or our opinions regarding the reasons for provocation.  At our leadership level we must support consistency in not tolerating inappropriate communications throughout the organization."  Mr. Krida copied Defendant's President, Mr. Christopher Kyte.

    30.    Plaintiff was pleased to receive the support from Mr. Krida, and his decision that, yes, policies require consistent application between members of high management and crew members.

    31.    Unfortunately, Defendant's President, Mr. Kyte, did not understand the EEO issues and uniformity issues Plaintiff and Krida were addressing. He was clearly angry.

    32.    Mr. Kyte, in an email of December 26, 2011, at 1:52 p.m., stated, in part, "I am the President of the Company," and injected how he, a male, was treated for his inappropriate "joke" about females.  Kyte stated that Plaintiff had "scolded" him and, he believed, Plaintiff was not acting in the best interest of the company.  Mr. Kyte also copied Mr. Krida.

    33.    Plaintiff undertook to professionally respond to both Mr. Krida's

email (of December 26) and Mr. Kyte email (also of December 26).

34.    To Mr. Krida's email, Plaintiff responded that consistency in discipline is important and that she believed it was in the company's best interest to treat Ms. Turner with the same courtesy recommended for Mr. Grisby—a Policy Reinforcement Discussion.  She closed by saying she did not mean for this matter to become a "big issue," but that she did not want the company to be accused of discrimination.  She also stated that she would adhere to the CEO's final decision.

35.    To Mr. Kyte's email, Plaintiff responded that she was trying to make a decision of consistency, and to keep Defendant out of court.  Plaintiff also stated she was not "scolding" Kyte for his inappropriate comments in an email but rather asking him to be careful.  This was no different than Corporate Human Resources had previously asked Kyte to do with respect to issues of ageism in an email.

36.    Upon information and belief, Mr. Kyte forwarded the email exchange to the Vice President, Mr. Grigsby, the person with whom consistency of discipline was being compared.

37.    On December 26, 2011, Mr. Grigsby sent a testy email to Plaintiff, Mr. Kyte and Ms. Stewart.  This email stated that he was "a tool for precedence" and that "[i]f anything is inappropriate, it's this mishandling of

information." Grigsby stated that he wanted "to discuss with you specifically tomorrow how you make objective decisions with subjective material."

38.    Grigsby also misstated the "precedent" being compared—Grigsby alluded to his comments relating to an employee's ability to perform a job, rather than his inappropriate comment that the employee was "sleeping" with someone else.

39.    The next day, December 27, 2011, Plaintiff responded to Ms. Grigsby in a professional tone. She told Mr. Grigsby that her "door is always open to you" but also that Grigsby's comment was not the one about the employee's perceived inability to handle the job, but Grigsby's comment about an "inappropriate relationship with one of her direct reports."

40.    Upon information and belief, Plaintiff's recommendation of no termination and no change to part time status for Ms. Turner was followed. However, the grudge against Plaintiff was, by this time, well established.

## RETALIATION AGAINST PLAINTIFF

41.    The emails from both Kyte and Grisby attest to their animus against Plaintiff's decision-making in matters of non-discrimination against a female.

42.    The policies apply equally to Kyte and Grisby, as they do lower level employees.

43. The Chief Executive Office, Mr. Krida, confirmed the equal application.

44. Grigsby became the "tool for precedence" by his *own* inappropriate action which the Company was forced to address.

45. Kyte, too, is to blame for any perceived "scolding" he received by virtue of his *own* inappropriate email which violates Defendant's own policies and procedures.

46. Grigsby and Kyte were angry because their conduct was actually addressed by a Human Resources official instead of simply being overlooked due to their position of high management.

47. Plaintiff engaged in legally protected conduct.  She *opposed* through her words and deeds an unlawful employment practice of treating a pregnant female differently than higher male management had been treated in instances of inappropriate language. See, e.g., *Crawford v. Metropolitan Government of Nashville & Davidson Cty*, 555 U.S. 271 (2009).  Additionally, Plaintiff *participated* in an investigation which involved establishing consistent, non-discriminatory discipline for a female employee in relation to male employees.

48. Thereafter, Plaintiff was treated differently—more harshly, with work being piled upon her, inconsistent assignments, and immediate

turnarounds. She also experienced the cold shoulder.

49. On January 4, 2012, less than ten (10) days from her opposition and participation conduct, Defendant terminated Plaintiff's employment.

50. Defendant terminated Plaintiff's employment in retaliation for her opposition and participation conduct, as set forth above.

51. The termination has been devastating to Plaintiff. She lost her position, which compensated her $2,615.38 bi-weekly (approximately $68,000 annually), plus various benefits (her back pay and benefits).[1] She has also suffered worry, anxiety, humiliation, anger, feelings of loss and hurt, and financial distress. Plaintiff seeks such compensatory damages, along with injunctive relief of reinstatement, full back pay, front pay to the extent applicable, and punitive damages because the actions were taken in reckless indifference to Plaintiffs' federally protected rights. Plaintiff also seeks her reasonable attorneys fees, along with costs.

52. Upon information and belief, D. Kendall Grisby has been separated from employment with Defendant at the instance of Defendant.

53. Upon information and belief, Christopher Kyte has been separated from employment with Defendant at the instance of Defendant.

---

[1] An increase to $2692.31 biweekly ($70,000 annually) would have become effective in six months.

## LEGAL CAUSE OF ACTION

54. Plaintiff brings the following cause of action under Title VII against Defendant:

    A. <u>Retaliation</u>.

55. Plaintiff respectfully demands a jury.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF requests Defendant Answer this Complaint, that Plaintiff be awarded all compensatory and punitive damages available, any other equitable relief, wage and benefit losses, attorneys fees, costs, prejudgment interest and post-judgment interest, and any further relief at either law or equity to which she may be entitled.

    Respectfully submitted,

    **GILBERT RUSSELL McWHERTER PLC**

    /s Justin S. Gilbert
    Justin S. Gilbert (TN Bar No. 017079)
    Jonathan L. Bobbitt (TN Bar No. 023515)
    101 North Highland
    Jackson, TN 38301
    Telephone: 731-664-1340
    Facsimile: 731-664-1540
    jgilbert@gilbertfirm.com
    jbobbitt@gilbertfirm.com

    ATTORNEYS FOR PLAINTIFF